# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TONY R. RASCHELLA,

      Plaintiff,

v.
                 **CIVIL ACTION NO. 1:04CV71**
                 **(Judge Keeley)**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

      Defendant.

## ORDER REMANDING CASE TO COMMISSIONER
## FOR FURTHER CONSIDERATION

Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on April 15, 2004, the Court referred this Social Security case to United States Magistrate John S. Kaull with directions to submit proposed findings of fact and a recommendation for disposition. On March 30, 2005, Magistrate Kaull filed his Opinion/Report and Recommendation and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the Report and Recommendation. On April 12, 2005, plaintiff, Tony R. Raschella, through counsel, Regina Carpenter, filed objections to the Magistrate Judge's Opinion/Report and Recommendation.

## ORDER REMANDING CASE TO COMMISSIONER
## FOR FURTHER CONSIDERATION

### I.   PROCEDURAL BACKGROUND

On July 1, 2002, Tony R. Raschella ("Raschella") filed an application for Disability Insurance Benefits "DIB" alleging disability since July 5, 2000,[1] due to an injury to his right ankle. The Commissioner denied Raschella's application initially and on reconsideration. Raschella requested a hearing and, on May 8, 2003, an Administrative Law Judge ("ALJ") conducted a hearing at which Raschella, represented by counsel, Regina L. Carpenter, Esquire, testified. A Vocational Expert ("VE"), also testified.

On July 19, 2003, the ALJ entered a decision finding Raschella was not disabled.  The Appeals Council denied Raschella's request for review, making the ALJ's decision the final decision of the Commissioner. On April 15, 2004, Raschella filed this action seeking review of the final decision.

### II.   PLAINTIFF'S BACKGROUND

At the time of the administrative hearing, Raschella was forty-one (41) years old. He has a high school education.  His past

---

[1] At the administrative hearing, Raschella amended his onset date to October 17, 2001.

relevant work history reflects employment as a shipping and receiving clerk.

### III.    **ADMINISTRATIVE FINDINGS**

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), the ALJ found:

1.    Raschella met the disability insured status requirements of the Social Security Act as of October 17, 2001, the amended onset date of disability, and continued to meet those requirements through December 31, 2006;

2.    Raschella has not engaged in substantial gainful work activity since the amended onset date of disability and his brief period of employment from January 21, 2002 to January 24, 2002 was an unsuccessful work attempt;

3.    The medical evidence of record establishes that the claimant has reflex sympathetic dystrophy of the right ankle;

4.    Raschella does not have an impairment or combination of impairments severe enough to meet or equal the requirements of any of the listed impairments set forth in Appendix 1, Subpart P, Social Security Administration Regulations No. 4;

5.    Raschella is a 41-year old younger individual, with a high school education, whose past relevant work was semiskilled in nature and light to heavy in exertional level who has not acquired skills that transfer to sedentary work;

## ORDER REMANDING CASE TO COMMISSIONER
### FOR FURTHER CONSIDERATION

6.  The record contains medical evidence of an impairment which could reasonably be expected to cause pain, but not to the extent alleged; therefore, Raschella's subjective complaints regarding pain are not fully credible;

7.  Raschella has the residual functional capacity to perform sedentary work and work with the upper extremities but not work with the legs. Due to the perception of pain, he is limited to simple routine tasks that do not require a great deal of concentration;

8.  Raschella does not have the residual functional capacity to perform his past relevant work since his past work activity was of a greater exertional level;

9.  Considering Raschella's impairments, he has the residual functional capacity to perform the jobs identified and enumerated by the vocational expert which exist in significant numbers in the national economy; and

10. Raschella is not disabled under the framework of Vocational Rule 201.28 of the Medical-Vocational Guidelines and has not been under a "disability," as defined in the Social Security Act, at any time since his amended onset date of disability of October 17, 2001.

### IV. OBJECTIONS

Raschella objects to the Magistrate Judge's report and recommendation contending that the Magistrate Judge erred in finding that the ALJ followed SSR 96-2p when he considered and evaluated the opinions of the treating orthopedic specialist, Dr.

### ORDER REMANDING CASE TO COMMISSIONER
### FOR FURTHER CONSIDERATION

Nick Zervos. Raschella alleges that, because Dr. Zervos has served as the primary care provider for his injury, has performed four surgeries and has examined him regularly, the ALJ should have assigned controlling weight to the opinion of Dr. Zervos.

### V. <u>MEDICAL EVIDENCE</u>

The medical evidence of record includes:

1.  A July 6, 2000, discharge summary from Fairmont General Hospital ("FGH") indicating an injury sustained at work when a four (4) inch staple penetrated Raschella's right ankle to its joint. Dr. Jack Koay surgically removed the staple, prescribed Vicodin and ordered Raschella to use crutches, elevate the ankle, and not bear weight on that ankle for six (6) weeks. Dr. Koay noted a hole in the medial malleolar area, which caused the medial malleolus to be weaker. Dr. Koay opined that Raschella was "[p]robably not able to return to work on heavy duty job, except the patient can have light duty or sitting job only";

2.  An August 14, 2000, limited bone scan at FGH indicating "increased uptake about the tibial aspect of the right ankle joint" that "may represent a septic arthritis." Janis Hurst, the radiologist who reviewed the scan, determined that correlation with a clinical exam or an MRI would be helpful in making a diagnosis;

## ORDER REMANDING CASE TO COMMISSIONER
## FOR FURTHER CONSIDERATION

3.   An August 23, 2000, report from Nick Zervos, M.D., Mountainstate Orthopedic Associates, Inc., indicating "discoloration of the skin around the whole foot and ankle region on the right" and "a change in the sweat pattern of the right foot," "some desensitization of the saphenous nerve . . . ." and "some dysesthetic pain and tingling and numbness . . . ." Dr. Zervos reviewed Raschella's x-ray and noted that the staple had "gone through the medial malleolus," but that "[i]t doesn't look like it [staple] traversed the articular weight bearing surface of the joint";

Dr. Zervos diagnosed "reflex sympathetic dystrophy ("RSD") of the right foot", recommended Raschella should not work for two (2) more months so that an effort to desensitize the sympathetic nerves could occur and prescribed physical therapy, Elavil, Lortab, vitamin B6 and a follow-up visit in one (1) month as well as possible treatment at a pain clinic;

4.   A September 21, 2000, report from Dr. Zervos indicating that Raschella's progress was "not much better with physical therapy alone and the Elavil." Dr. Zervos sought permission from Workers' Compensation for a pain clinic;

6

## ORDER REMANDING CASE TO COMMISSIONER
### FOR FURTHER CONSIDERATION

5.   A November 2, 2000, letter from Dr. Zervos to Workers'
Compensation Fund indicating Raschella's continued pain, stating
that Raschella had an appointment with a pain clinic and requesting
approval to schedule three (3) months of physical therapy. Dr.
Zervos noted Raschella was scheduled to return to work on
November 3, 2000 on a trial basis;

6.   A November 10, 2000, pain clinic report from Richard M.
Vaglienti, M.D. indicating complaints of burning pain in the right
foot, intermittent edema, non-dermal distribution of pain,
excessive dryness, and temperature variance as compared to the left
foot. Dr. Vaglienti diagnosed "[s]ympathetically mediated pain"
and probable RSD and prescribed Neurontin 300 mg, "[l]umbar
sympathetic block to be done with radiofrequency if local
anesthetic does not last," and physical therapy;

7.   A November 28, 2000, letter from Dr. Zervos to Workers'
Compensation requesting approval for sympathetic nerve root blocks
with radiotherapy;

8.   A December 14, 2000, letter from Dr. Zervos to Workers'
Compensation indicating he had injected Raschella's ankle joint
with 4cc of Marcaine resulting in "nearly complete pain relief."
Based on the results of the injection of Marcaine, Dr. Zervos

believed that it represented "ankle pathology, possibly even a loose body or scar formation from the staple injury in his ankle" Dr. Zervos reported that Raschella was being treated at the pain clinic for "reflex sympathetic dystrophy," but opined he felt Raschella suffered from "ankle intra-articular pathology." Dr. Zervos requested authorization to perform an arthroscopic exam and "debridement of any ankle pathology," which he believed would permit complete recovery and no permanent disability;

9. A January 9, 2001, operative note from Dr. Vaglienti at Healthsouth indicating Raschella had a right lumbar sympathetic block resulting in "pain relief after the procedure" and "pain free range of motion in the ankle";

10. A January 11, 2001, office note from Dr. Zervos, indicating Raschella reported "nearly 100% relief" from ankle pain with the block and discussing the ankle surgery which they decided "to go ahead and proceed with that in the near future";

11. A February 13, 2001, letter from Dr. Zervos to Workers' Compensation indicating that on February 5, 2001 Raschella had an arthroscopic right ankle debridement, and reporting that he had "[m]oderate pain at the incision." Dr. Zervos noted a "[d]ecent range of motion" and a little stiffness and felt Raschella could

return to physical therapy after the removal of the stitches but should remain off work for four (4) to eight (8) weeks;

12. A March 13, 2001, office note from Dr. Zervos indicating continued improvement, not pain free, but his ankle had "decent range of motion." Dr. Zervos instructed Raschella to continue his home exercises, released him to work at light duty, and suggested a follow-up in four (4) to six (6) weeks at which time, if improvements continued, he might return Raschella to full duties;

13. An April 4, 2001, office note from Dr. Zervos indicating Raschella was working but was having to take "Hydrococone more than @ [sic] hours." Dr. Zervos prescribed Darvocet N 100 one or two every four to six hours;

14. An April 24, 2001, office note from Dr. Zervos indicating Raschella complained his pain had not improved with the surgery. Dr. Zervos noted Raschella was "not much better at all" with pain present both medially and laterally and "along the posterior tib and the peroneal tendon", minimal discoloration of the right foot, decent range of motion, and moderate swelling. Dr. Zervos could not determine whether the condition was RSD or an "overuse injury". He instructed Raschella to wear a CAM boot for five (5) weeks, to

continue flexibility exercises, prescribed Lortab and instructed him to return in five (5) weeks for a follow-up examination;

15.  A May 29, 2001, office note from Dr. Zervos indicating Raschella's right ankle was "[b]etter with the CAM boot immobilization" and noting Raschella experienced pain "mainly in posterior tib tendon and over the medial malleolus." Dr. Zervos thought Raschella might have posterior tib tendinitis and recommended Raschella "get a full-length firm accommodative orthotic." Dr. Zervos prescribed an air splint for wear at home, a CAM boot for wear during work, and Lodine 400 b.i.d.;

16.  A July 5, 2001, office note from Dr. Zervos indicating that Raschella had continued pain, the air splint and CAM boot seemed "to help a little," mild swelling and ability "to do a single and double toe raise." Dr. Zeros again noted his belief that Raschella suffered from posterior tib tendinitis, and continued his conservative treatment with pain medication, orthotic, and CAM boot. He instructed Raschella to return in four (4) to six (6) weeks, at which time he would consider surgery to debride the tendon if his condition did not improve;

17.  An August 21, 2001, letter from Dr. Zervos to Workers' Compensation indicating continued pain and requesting authorization

10

to perform a "posterior tib tendon debridement and possible repair." He noted Raschella "probably has some sort of scarring or tearing of the posterior tib tendon and would benefit" from the procedure;

18. An October 9, 2001, office note from Dr. Zervos indicating he had received authorization from Workers' Compensation to perform the debridement and noting he wanted to "see what the tendon looks like, see if we need to do anything more than that";

19. An October 17, 2001, the amended onset date, report of operation from Monongalia General Hospital indicating Dr. Zervos performed a "posterior tendon flexor digitorum longus debridement, sterior tibial tendon sheath repair and tarsal tunnel release". During the pre-surgery evaluation Dr. Zervos noted the x-rays of the right ankle "were negative as far as the bony pathology is concerned".

During the procedure, the "posterior tibial tendon . . . was released completely." Dr. Zervos noted moderate synovitis distally, "not much" tendinitis proximally, a "small defect in the undersurface of the posterior tibial tendon sheath . . . was debrided and repaired," as was the tendinitis "along the posterior tibial tendon . . . .", the tendinitis along the flexor digitorum

11

longus sheath was debrided and revealed "no longitudinal tears or degenerative changes. The flexor digitorum sheath were . . . repaired." The tarsal tunnel area was released and revealed moderate scarring. Dr. Zervos also noted no transection of the posterior tibial nerve or signs of arterial damage;

20. A November 1, 2001, office note from Dr. Zervos indicating Raschella seemed "to feel his pain before surgery is gone and most of his pain is surgical at this point." Dr. Zervos removed the stitches, provided a CAM boot and instructed Raschella to begin "partial 25% weight bearing." Dr. Zervos continued Raschella on temporary total disability until "we get him back to full snuff which will probably be in a couple months";

21. A November 20, 2001, office note from Dr. Zervos indicating Raschella was slightly erythematous but had no signs of purulent drainage. Dr. Zervos instructed him to continue his "range of motion exercises", return in one (1) week for reevaluation and continued the Keflex and Lortab;

22. A November 29, 2001, office note from Dr. Zervos indicating Raschella informed him that 1) his pain had improved post-surgery; 2) he did not need to take medication all the time only when his ankle hurt; 3) the pain medication was effective in

treating the pain; 4) the pain medication had not affected the pain pre-surgery; and 5) he experienced no numbness or tingling. Dr. Zervos noted that Raschella's ankle was "very stiff and swollen" and lacked "full range of motion." Dr. Zervos instructed Raschella to begin weight bearing, as tolerated in a CAM boot, for six (6) weeks, ordered "physical therapy to work on range of motion" and noted Raschella would require another three (3) to five (5) months recovery time;

23. A January 10, 2002, office note from Dr. Zervos indicating Raschella felt he was "improving gradually," taking less pain medication, experiencing pain only in "palpation," and experiencing improved range of motion. Dr. Zervos instructed Raschella to increase his activity in a home exercise program, continued the Loratab and noted a possible return to work during the next two (2) or three (3) months;

24. A January 14, 2002, report from Manchin Clinic indicating Raschella began physical therapy including electronic stimulation, ultrasound, therapeutic exercises, and pool therapy;

25. A January 24, 2002, letter from Dr. Zervos to Workers' Compensation indicating Raschella had returned to work on January 21, 2002 and worked for two (2) days, until his ankle

became swollen and tender.  Dr.  Zervos stated Raschella could not "return to work at this point" and recommended a "CAM boot immobilization protection and physical therapy for four to six weeks . . . ";

26.  A January 30, 2002, Manchin Clinic physical therapist office note indicating Raschella's ankle was "feeling better but he was still having to wear the boot to relieve pressure";

27.  A January 31, 2002, Manchin Clinic physical therapist office note indicating Raschella was "in constant pain" with his right ankle and that he increased the wearing time for the boot to decrease swelling in the ankle;

28.  A February 1, 2002, Manchin Clinic physical therapist office note indicating no new complaints;

29.  A February 6, 2002, Manchin Clinic physical therapist office note indicating Raschella reported he was "in constant pain from his ankle," elevated his leg in the evening, and had increased swelling in the right ankle. The physical therapist noted Raschella was not wearing his supportive boot;

30.  A February 8, 2002, Manchin Clinic physical therapist office note indicating Raschella was "having increased pain."  The therapist noted Raschella was wearing his supportive boot;

14

31. A February 13, 2002, Manchin Clinic physical therapist office note that Raschella cancelled his appointment;

32. A February 15, 2002, Manchin Clinic physical therapist office note indicating Raschella reported Dr. Zervos said at the February 14, 2002 visit that "he should continue therapy";

33. A February 18, 2002, Manchin Clinic physical therapist office note indicating Raschella was experiencing pain that "doesn't stop,";

34. A February 20, 2002, Manchin Clinic physical therapist office note indicating Raschella said the Vioxx had "not helped him" and that his pain had increased;

35. A February 21, 2002, office note from Dr. Zervos, indicating complaints of a burning pain along the anterior medial joint line, which was different from the pre-surgery pain. Dr. Zervos injected Raschella with Marcaine and Lodocaine which provided some pain relief and instructed him to massage the area with ice;

36. A March 1, 2002, Manchin Clinic physical therapist office note indicating Raschella did not attend his physical therapy session;

37.   A March 4, 2002, Manchin Clinic physical therapist office note indicating Raschella said his pain was worse because of weather changes;

38.   A March 8, 2002, Manchin Clinic physical therapist office note indicating Raschella did not attend his physical therapy session;

39.   A March 19, 2002, letter from Dr. Zervos to Workers' Compensation indicating Raschella's pain had returned after the February 21, 2002, injection. Dr. Zervos observed "mainly anterior joint line pain along the ankle", "decreased range of motion," and "[n]o signs of tarsal tunnel syndrome." Dr. Zervos requested authorization to perform an arthroscopic exam and debridement of the right ankle;

40.   An April 8, 2002, report of operation from Monongalia General Hospital indicating Raschella had an arthroscopic debridement of the medial gutter. Dr. Zervos observed a significant amount of scarring and abrasion along the talar dome and significant scarring synovitis and right saphenous neuroma excision. The medial gutter "was debrided to normal appearing medial gutter."  "The saphenous nerve was proceeding along the saphenous vein and extended into the scarred region," where the

"nerve appeared to end bluntly . . . and was found to be a neuroma." This was "dissected free" to where "it was one viable nerve." A drill hole was made in the distal tibia and the saphenous nerve was buried in this hole;

41. An April 20, 2002, office note from Dr. Zervos indicating less tenderness at his original injury sight and improvement at the joint due to the debridement. Dr. Zervos removed the stitches, instructed Raschella to begin early range of motion exercises and return in three (3) to four (4) weeks;

42. A May 7, 2002, office note from Dr. Zervos indicating Raschella thought the neuroma excision "helped his pain into the bottom of his foot . . . but [the pain had] . . . moved proximally where his neuroma excision was." Dr. Zervos prescribed Elavil for sleeping difficulties, Lortab for pain, and a home desensitization program;

43. A June 11, 2002, office note from Dr. Zervos indicating complaints of ankle stiffness and pain medially and neuromatous pain proximally. Dr. Zervos noted that the swelling had improved. Dr. Zervos released Raschella from work for the next six (6) weeks;

## ORDER REMANDING CASE TO COMMISSIONER
## FOR FURTHER CONSIDERATION

44.   A July 23, 2002, letter from Dr. Zervos to Workers'
Compensation indicating that Raschella was "not any better from his
recent ankle surgery."  Dr. Zervos noted that Raschella's symptoms
included pain, ankle discomfort, numbness, and tingling at the
bottom of his foot and stated that Raschella could have been
"developing a repeat tarsal tunnel syndrome and . . . repeat
decompression of that tarsal tunnel would be helpful";

45.   A July 30, 2002, Activities of Daily Living form
completed by Raschella indicating his activities of daily living
included no trouble sleeping at night, going to bed at 11:00 p.m.,
rising between 8:00 a.m. and 9:30 a.m., no napping, did not need
help with his personal needs and grooming, prepared frozen dinners
for lunch and full course meals occasionally for dinner, mopped
floors, washed dishes, relied on his wife for help with household
chores and on his brother and brother-in-law for the care of his
lawn, was able to shop for food for up to one-half hour at a time,
could drive and walk (sometimes with the aide of a CAM boot) and
did not rely on others for transportation, read newspapers for one
(1) hour per day, and watched television for (4) four hours per
day.  Raschella noted that prior to his injury his hobbies were
painting, sports, movies, gardening, and woodworking but that he

## ORDER REMANDING CASE TO COMMISSIONER
## FOR FURTHER CONSIDERATION

was no longer able to participate in these activities. He also noted difficulty standing for long periods of time and experiencing pain all the time.

Raschella reported visiting or being visited by relatives three (3) times per week for three (3) hours per visit and visiting his mother seven (7) days per week for one (1) hour per visit, visiting or being visited by friends two (2) times per week for one-half hour per visit, denied any changes in his social activities and denied problems getting along with people after the onset of his injury. Raschella also noted he had no difficulties in concentrating, finishing tasks or following written or spoken instructions prior to or after his ankle injury;

46. An August 14, 2002, report of operation from Dr. Zervos indicating Raschella had a right tarsal tunnel release at Monongalia General Hospital. The retinaculum and tarsal tunnel were slowly released; a laceration of the posterior tibial vein was repaired; and the posterior tibial nerve was dissected and released completely into the foot's plantar;

47. An August 27, 2002, letter from Dr. Zervos to Workers' Compensation detailing a post-surgery examination. Dr. Zervos indicated that Raschella presented with extreme pain and possible

RSD. Dr. Zervos removed his stitches, prescribed Neurontin and Lortab and sought authorization for treatment at a pain clinic for "possible sympathetic ganglion";

48. An August 28, 2002, residual functional capacity from ("RFC") from Thomas Lauderman, a state agency physician indicating Raschella was able to lift and/or carry fifty (50) pounds occasionally; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk with normal breaks for about six (6) hours in an eight (8) hour workday; sit with normal breaks for a total of about six (6) hours in an eight (8) hour workday; unlimited ability to push and/or pull; postural limitations including no climbing ladders, ropes, or scaffolds, no manipulative, visual, or communicative limitations, and no exposure to heights because of his medication. Dr. Lauderman determined Raschella had the RFC to perform medium work;

49. A November 8, 2002, history and physical examination form from Kenneth R. Noel, M.D. and Charles Joachim, M.D., West Virginia Pain Treatment Center, indicating complaints of a pain level at "10/10" and constant, "an ache and throbbing" pain and "burning pain." Raschella reported that he had not worn matching shoes in over a year, that temperature changes increased his pain level, and

that pain resulted when his foot came into contact with socks or blankets. Raschella was taking Hydrocodone 7.5/500 two (2) to three (3) times per day, had been taking Neurotin 100 mg q hs for the past two (2) years, and had undergone physical therapy after the first, third, and fifth operations on his ankle.

Physical examination revealed an antalgic gait, walk was "without dorsiflexion on the right with weight bearing on the lateral aspect of his foot", "no significant edema in the right ankle and foot" when compared to the left ankle and foot, equal right and left skin appendages, decreased "[r]ange of motion of the right ankle and foot in dorsiflexion, plantar flexion, eversion, inversion, and toe flexion", normal toe extension and the right foot was not colder than the left foot. Drs. Noel and Joachim noted movement in all axes caused pain and observed "a moderate amount of mechanical allodynia present, most notably in the medial aspect of the right ankle."

The doctors diagnosed tarsal tunnel syndrome and complex regional pain syndrome of the right ankle and foot and formulated a treatment plan including: 1) increase Neurontin gradually to 1800 mg qd over the next three (3) to four (4) weeks; 2) place Lidoderm patches on the medial aspect of the ankle; 3) rule out NSAIDS

because of Raschella's "marked GI disturbances" when taking these medications; and 4) return to pain clinic in two (2) months.

Drs. Noel and Joachim also formulated a long-term treatment plan: 1) topical ketamine and Lidoderm cream if Lidoderm patches and Neurotin failed to ease the pain; 2) oral methadone or Clonidine; 3) re-enrollment in physical therapy if pain relief from the medications occurred; or 4) a spinal cord stimulator if no pain relief occurred with medications;

50. A December 3, 2002, RFC from Fulvio R. Franyutti, M.D., a state agency physician, indicating Raschella could occasionally lift/carry fifty (50) pounds; frequently lift/carry twenty-five (25) pounds; stand/walk with normal breaks for a total of about six (6) hours in an eight (8) hour workday; sit with normal breaks for a total of about six (6) hours in an eight (8) hour workday; and unlimited ability to push and/or pull; no climbing ladders, ropes, or scaffolds; no manipulative, visual, or communicative limitations; no exposure to heights. Dr. Franyutti determined Raschella had the RFC to perform medium work;

51. A December 17, 2002, letter from Dr. Zervos to Workers' Compensation indicating Raschella was "not any better with regards to his foot and ankle pain" and had "saphenous type neuroma and

pain medial arch." Dr. Zervos believed Raschella could have had "some early RSD," for which he was "seeking pain clinic involvement." Dr. Zervos prescribed Lortab 7.5mg and continued treatment at the pain clinic. Additionally, Dr. Zervos noted an injection of the saphenous nerve may be necessary. Dr. Zervos opined Raschella may "not be able to return to his previous line of work which is a standing job at a machine factory . . . ." but may require a job with "sedentary duty in the future";

52. A January 16, 2003, letter from Dr. Zervos to Dr. Noel expressing his support for applying a pain stimulator, such as sympathetic blocks or inpatient epidural catheter, to "alleviate the RSD symptoms before trying to undergo any implantable device";

53. A February 20, 2003, letter from Dr. Zervos to Workers' Compensation indicating the necessity of an evaluation through the pain clinic, suggestion that "a spinal cord stimulator trial and permanent one should be authorized to try to compensate" Raschella's pain, and continuation of Loratab, Neurontin and Elavil;

54. A March 26, 2003, discharge summary from West Virginia University Hospitals indicating placement of a lumbar spinal cord stimulator, single lead intervention resulting "approximately 50%

decrease in pain with the spinal cord lead prior to discharge".
The summary also noted that Raschella ambulated independently and
was able to care for himself;

55.  An April 2, 2003, procedure form from West Virginia
University Hospital Center for Pain Management indicating removal
of the stimulator. Raschella reported 75% to 80% pain relief with
the stimulator trial;

56.  An April 17, 2003, office note from Dr. Zervos indicating
the spinal cord stimulator trial had improved the foot pain and
that, upon its removal, the pain had increased "tenfold" and
included dysesthetic pain and discomfort.  Dr. Zervos prescribed
Lortab 10mg and return in two (2) months;

57.  An April 17, 2003, letter from Dr.  Zervos to Workers'
Compensation indicating:

> I saw Mr. Tony Raschella back for his RSD of
> his foot.  He had a trial of spinal cord
> stimulator through the pain clinic and that
> did improve his pain moderately.  At this
> point I think he is filing for disability
> because he does not believe he can return to
> his previous line of work and I think that's
> agreeable. I do agree with the pain clinic
> that a spinal cord stimulator would be
> beneficial for him, and by way of this letter
> I would like to authorize that as medically
> necessary.

**ORDER REMANDING CASE TO COMMISSIONER**
**FOR FURTHER CONSIDERATION**

Dr. Zervos prescribed Lortab 10 mg and stated that it should be

intermittently authorized as needed; and

    58.  An April 17, 2003, letter from Dr. Zervos to Raschella's

counsel, indicating:

> This is a letter on Tony Raschella. I have
> been treating him since August 23, 200. I have
> seen Mr. Raschella between every 6 to 12
> weeks.
>
> His current diagnosis is reflex sympathetic
> dystrophy from a nail gun injury to his ankle.
>
> In my opinion the nature and severity of Mr.
> Raschella's symptoms are credible and
> consistent with his objective findings as well
> with RSD which is what his diagnosis is RSD is
> a condition of the nerves that cause
> significant discomfort and pain with any
> activity and with just rest.
>
> As per item four of the page I have on
> categories of impairment are arthritis of the
> weight bearing joints of the upper or lower
> extremities, as well as disorders of the
> spine, he has reflex sympathetic dystrophy
> which is not associated with arthritis of the
> joint at the ankle. I do not believe I can
> answer that question adequately with those
> categories.
>
> As far as ability to do work related
> activities, at this point he has difficulty
> sitting let alone standing. He is unable to
> wear a regular shoe because of his pain. He
> is unable to lift/carry anything. He can't
> work around moving machinery or height because
> of the dangers of falls or injuries.
> Vibrations would probably be a problem with

him as well. He couldn't stoop, crouch, kneel
or crawl for any significant period of time
and/or push or pull. He mainly would be
limited to sedentary duty and work with the
upper extremities and not work with the legs.
I believe he does meet specific requirements
needed for disability with his reflex
sympathetic dystrophy, just in the nature of
his problem he has to take a significant
amount of narcotic pain medication to provide
pain relief. He does not sit for prolonged
periods of time or stand because of the nature
of his pain. He subsequently also has to lay
[sic] down a significant portion of the day to
decrease pain and swelling in his leg. At this
point I do not believe Mr. Raschella is a good
candidate for any type of work that would
involve sitting or standing for any length of
time. I do not believe he would be a candidate
for any job that would provide eight hours of
work of any type.

## VI.  DISCUSSION

Raschella contends the ALJ failed to afford proper weight to

the opinions of the  treating physician as required by SSR 96-2p.

SSR 96-2p states, in part, the following:

Controlling weight.  This is the term
used in 20CFR 404.1527(d)(2) and 416.927(d)(2)
to describe the weight we give to a medical
opinion from a treating source that must be
adopted. The rule on controlling weight
applies when all of the following are present:

•       The opinion must come from a "treating
source," as defined in 20CFR 404.1502 and
416.902. Although opinions from other
acceptable medical sources may be

26

**ORDER REMANDING CASE TO COMMISSIONER
FOR FURTHER CONSIDERATION**

entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

- The opinion must be a "medical opinion." Under 20CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See **SSR 96-5P**, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

- The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

- Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight.

20 C.F.R. § 404.1527 provides:

(d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical

27

ORDER REMANDING CASE TO COMMISSIONER
FOR FURTHER CONSIDERATION

opinion we receive. Unless we give a treating
source's opinion controlling weight under
paragraph (d)(2) of this section, we consider
all of the following factors in deciding the
weight we give to any medical opinion

(1)     *Examining    relationship.*
Generally we give more weight to the
opinion of a source who has examined
you than to the opinion of a source
who has not examined you.

(2)     *Treatment    relationship.*
Generally, we give more weight to
opinions from your treating sources,
since these sources are likely to be
the medical professionals most able
to provide a detailed, longitudinal
picture     of     your     medical
impairment(s) and may bring a unique
perspective to the medical evidence
that cannot be obtained from the
objective medical findings alone or
from     reports     of     individual
examinations, such as consultative
examinations     or     brief
hospitalizations. If we find that a
treating source's opinion on the
issue(s) of the nature and severity
of your impairment(s) is well
supported by medically acceptable
clinical and laboratory diagnostic
techniques and is not inconsistent
with the other substantial evidence
in [the] case record, we will give
it controlling weight. When we do
not give the treating source's
opinion controlling weight, we apply
the factors listed in paragraphs
(d)(2)(i) and (d)(2)(ii) of this
section, as well as the factors in
paragraphs (d)(3) through (d)(6) of

this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

## ORDER REMANDING CASE TO COMMISSIONER
## FOR FURTHER CONSIDERATION

> (4) *Consistency*.      Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion. (Emphasis added).

In <u>Craig v. Chater</u>, 76 F.3d 585, 590(4th Cir. 1996), the

Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony 'be given controlling weight.' <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. § 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> [4,5] By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

Raschella alleges that the ALJ did not follow the necessary

steps in determining the issue of controlling weight. In his

decision, the ALJ discussed Dr. Zervos' role as "treating source"

physician and his "medical opinions" about the nature and severity

of Raschella's impairments. The ALJ noted that Dr. Zervos treated

## ORDER REMANDING CASE TO COMMISSIONER
### FOR FURTHER CONSIDERATION

Raschella from August of 2000 to mid-2003, and that his treatment included examinations, referrals to a pain clinic, referrals to physical therapy, in-office treatments, prescriptions for orthotics and pain medications, and four major surgeries.[2] The ALJ further recognized that Dr. Zervos had opined that Raschella suffered from "reflex sympathetic dystrophy of the right foot" and "repeat tarsal tunnel syndrome." The ALJ also noted the "clinical and laboratory diagnostic techniques," such as x-rays and bone scans, that Dr. Zervos used in diagnosing and treating Raschella.

The ALJ also noted that Dr. Zervos had released Raschella to "return to light duty with the restriction of no lifting greater than 10 pounds" on March 31, 2002. The record does not indicate how long Raschella was able to work after this, or even if he actually returned to work at this time, but does indicate that, after that release, on April 8, 2002, Dr. Zervos had to perform an arthroscopic debridement of the medial gutter, and continued to treat Raschella.

---

[2] Those surgeries include: 1) on February 13, 2001, a right ankle debridement; 2) on October 17, 2001, a posterior tendon flexor digitorum longus debridement, sterior tibial tendon sheath repair and tarsal tunnel release; 3) on April 8, 2002, an arthroscopic debridement of the medial gutter; and 4) on August 14, 2002, a right tarsal tunnel release.

## ORDER REMANDING CASE TO COMMISSIONER
## FOR FURTHER CONSIDERATION

The ALJ found a letter Dr. Zervos wrote to Raschella's attorney a year later, on April 17, 2003 to be significant to his decision. In that letter, Dr. Zervos stated that, due to difficulty sitting, let alone standing, inability to wear a regular shoe due to pain, inability to lift or carry anything, inability to work around moving machinery or height because of the dangers of falls or injuries, inability to tolerate vibrations, inability to stoop, crouch, kneel or crawl for any significant period of time and/or push or pull, Raschella would be limited to "sedentary duty and work with the upper extremities and not work with the legs." However, in a later paragraph of the same April 17, 2003 letter Dr. Zervos stated:

> At this point I do not believe Mr. Raschella is a good candidate for any type of work that would involve sitting or standing for any length of time. I do not believe he would be a candidate for any job that would provide eight hours of work of any type. (Emphasis added.)

In his opinion, the ALJ stated that:

> [t]he undersigned Administrative Law Judge does not place great weight on Dr. Zervos' opinion expressed in Exhibit 14F, Page 3, that the claimant cannot work as it conflicts with [his] own statement made on the same date that the claimant could perform sedentary work not involving use of the lower extremities.

## ORDER REMANDING CASE TO COMMISSIONER
## FOR FURTHER CONSIDERATION

Dr. Zervos' letter clearly contains inconsistent statements. From his statements one could conclude that Dr. Zervos possibly believed Raschella might, at a later time, be capable of sedentary work, if the work did not involve work with the legs or feet. But it also appears that, at least as of April 17, 2003, Dr. Zervos had concluded Raschella was not a good candidate for _any_ type of work that involved sitting or standing for any length of time or any job that required eight hours of _any_ type of work.

Because the wording of the April 17, 2003 letter is ambiguous and perhaps even contradictory, the ALJ should have requested that Dr. Zervos clarify his opinion since no other physician had been as intimately involved in this case and could know the state of Raschella's capacity for work any better than Dr. Zervos.

Moreover, in another letter on April 17, 2003 to Workers' Compensation, Dr. Zervos requested placement of a lumbar spinal cord stimulator following a trial of a lumbar spinal cord stimulator in which Raschella had reported 75% to 80% relief from pain. Although, in his opinion, the ALJ noted [Raschella] "had good pain relief with the trial spinal cord stimulator, and has requested and been approved by his workers' compensation carrier for a permanent spinal cord stimulator," the record contains no

**ORDER REMANDING CASE TO COMMISSIONER
FOR FURTHER CONSIDERATION**

indication that Raschella, in fact, ever received the permanent

spinal cord stimulator or, if he did, whether it again provided

satisfactory relief from pain.   This additional information would

add critical information regarding Raschella's ability to work as

of July 19, 2003.

SSR 96-2p Policy Interpretation Ruling Titles II and XVI,

Giving Controlling Weight to Treating Source Medical Opinions,

provides:

> When a Treating Source's Medical Opinion is
> not Entitled to Controlling Weight
>
> Adjudicators must remember that a finding that
> a treating source medical opinion is not well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques or is
> inconsistent with the other substantial
> evidence in the case record means only that
> the opinion is not entitled to "controlling
> weight," not that the opinion should be
> rejected. <u>Treating source medical opinions are
> still entitled to deference and must be
> weighed using all of the factors provided in
> 20 CFR 404.1527 and 416.927. In many cases, a
> treating source's medical opinion will be
> entitled to the greatest weight and should be
> adopted, even if it does not meet the test for
> controlling weight</u>.
>
> <u>Also, in some instances, additional
> development required by a case--for example,
> to obtain more evidence or to clarify reported
> clinical signs or laboratory findings--may
> provide the requisite support for a treating
> source's medical opinion that at first</u>

## ORDER REMANDING CASE TO COMMISSIONER
## FOR FURTHER CONSIDERATION

> appeared to be lacking or may reconcile what
> at first appeared to be an inconsistency
> between a treating source's medical opinion
> and the other substantial evidence in the case
> record. In such instances, the treating
> source's medical opinion will become
> controlling if, after such development, the
> opinion meets the test for controlling weight.
> Conversely, the additional development may
> show that the treating source's medical
> opinion is not well-supported by medically
> acceptable clinical and laboratory diagnostic
> techniques or may create an inconsistency
> between the medical opinion and the other
> substantial evidence in the case record, even
> though the medical opinion at first appeared
> to meet the test for controlling weight.
> Ordinarily, development should not be
> undertaken for the purpose of determining
> whether a treating source's medical opinion
> should receive controlling weight if the case
> record is otherwise adequately developed.
> However, in cases at the administrative law
> judge (ALJ) or Appeals Council (AC) level, the
> ALJ or the AC may need to consult a medical
> expert to gain more insight into what the
> clinical signs and laboratory findings signify
> in order to decide whether a medical opinion
> is well-supported or whether it is not
> inconsistent with other substantial evidence
> in the case record.

(Emphasis added.)

Here, the Court finds that substantive, outcome determinative questions persist regarding whether Raschella received the permanent spinal cord stimulator, whether it provided the expected

**ORDER REMANDING CASE TO COMMISSIONER
FOR FURTHER CONSIDERATION**

relief, and whether Raschella is capable of performing any type of work, including sedentary work, due to his pain.

Therefore, the Court finds that the record does not contain substantial evidence to support the ALJ's analysis of Dr. Zervos' medical opinion pursuant to SSR 96-2p and his decision not to assign controlling weight to the opinion of the treating physician. Therefore, the Court finds that this matter should be remanded to the Commissioner for further consideration.

### VII. <u>CONCLUSION</u>

Upon examination of Raschella's objections and upon an independent <u>de novo</u> consideration of all matters now before it, the Court is of the opinion that this matter should be remanded to the Commissioner for further evaluation.

The Court, therefore, rejects the Magistrate Judge's Opinion/Report and Recommendation and **ORDERS** that this civil action be **REMANDED**. Accordingly,

1.  the defendant's motion for Summary Judgment (Docket No. 10) is **DENIED;**

2.  the plaintiff's motion for Summary Judgment (Docket No. 9) is **DENIED;**

### ORDER REMANDING CASE TO COMMISSIONER
### FOR FURTHER CONSIDERATION

3.    Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), this matter is **REMANDED** to the Commissioner for further evaluation; and

4.    This civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58. If a petition for fees pursuant to the Equal Access to Justice Act (EAJA) is contemplated, the plaintiff is warned that, as announced in <u>Shalala v. Schaefer</u>, 113 S.Ct. 2625 (1993), the time for such a petition expires ninety days thereafter.

The Clerk of the Court is directed to transmit copies of this Order to counsel of record.

DATED: August _____ *19* _____, 2005.


IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE